***No. 24-4852***

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

BRITTANY K. MACDONALD,

*Plaintiff-Appellant,*

v.

OREGON HEALTH AND SCIENCE UNIVERSITY, WAYNE MONFRIES, RUTH BEYER, MAHTAB BRAR, JAMES A. CARLSON, DANNY JACOBS, SUSAN KING, CHAD PAULSON, SUE STEWARD, STEVE ZIKA, and DOES 1-50

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Oregon
Hon. Karin J. Immergut
Case No. 3:22-cv-01942-IM

---

# APPELLEES' ANSWERING BRIEF

---

BRENDA K. BAUMGART
brenda.baumgart@stoel.com
ALEX VAN RYSSELBERGHE
Alex.vanrysselberghe@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

WHITNEY A. BROWN
whitney.brown@stoel.com
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
Facsimile: 907.277.1920

*Attorneys for Appellees*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iii

JURISDICTIONAL STATEMENT ........ 1

ISSUE PRESENTED FOR REVIEW ........ 1

INTRODUCTION ........ 2

STATEMENT OF THE CASE ........ 3

I. Factual Background ........ 3

a. OHSU ........ 3

b. The COVID-19 Pandemic ........ 5

c. OHSU's Response to COVID-19 ........ 6

d. MacDonald's Work in OHSU's MBU ........ 11

e. MacDonald's Exception Request ........ 13

II. Procedural History ........ 14

STATEMENT REGARDING ADDENDUM ........ 18

SUMMARY OF THE ARGUMENT ........ 18

ARGUMENT ........ 20

I. Standard of Review ........ 20

II. MacDonald's First Amendment claims fail as a matter of law because she cannot show that the Individual Defendants violated any constitutional right that was clearly established at the time her religious exception request was denied ........ 21

## TABLE OF CONTENTS
(continued)

**Page**

III. MacDonald failed to raise a triable issue of fact as to her Title VII failure-to-accommodate claim. ....30

A. MacDonald's complaint raised a failure-to-accommodate claim, not an intentional-discrimination disparate-treatment claim. ....31

B. Unlike disparate-treatment claims predicated on intentional discrimination, failure-to-accommodate claims do not require delving into a defendant's motives. ....34

C. Regardless, MacDonald fails to raise a genuine issue of material fact concerning OHSU's intent. ....41

CONCLUSION ....44

STATEMENT OF RELATED CASES ....45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ....................................................................21

*Aka v. Wash. Hosp. Ctr.*,
156 F.3d 1284 (D.C. Cir. 1998)....................................................................37

*Anderson v. Creighton*,
483 U.S. 635 (1987)...............................................................................23, 25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).......................................................................................40

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ........................................................................20

*Ariz. v. Mayorkas*,
143 S. Ct. 1312 (May 18, 2023) (statement of Gorsuch, J.)...............................27

*Arpin v. Santa Clara Valley Transp. Agency*,
261 F.3d 912 (9th Cir. 2001) ........................................................................43

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011).......................................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................21

*Bacon v. Woodward*,
104 F.4th 744 (9th Cir. 2024) .......................................................................28

*Bannister v. Bd. of Trs.*,
No. 03-0094-E-BLW, 2005 WL 8165506 (D. Idaho Jan. 18, 2005)..................37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................21

*Berry v. Dep't of Soc. Servs.*,
447 F.3d 642 (9th Cir. 2006) ........................................................................40

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Bodett v. CoxCom, Inc.*,
366 F.3d 736 (9th Cir. 2004) ....................................................33, 35, 36

*Bragdon v. Abbott*,
524 U.S. 624 (1998).............................................................................44

*Brosseau v. Haugen*,
543 U.S. 194 (2004)........................................................................passim

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014).............................................................................27

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993).......................................................................24, 25

*City of Tahlequah, Okla. v. Bond*,
595 U.S. 9 (2021) (per curiam)...........................................................23

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) .............................................................31

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) ...............................................................3

*Crowe v. Wormuth*,
74 F.4th 1011 (9th Cir. 2023) ..............................................................32

*Davis v. Team Elec. Co.*,
520 F.3d 1080 (9th Cir. 2008) .............................................................42

*Dist. of Columbia v. Wesby*,
583 U.S. 48 (2018).........................................................................22, 25

*Dodge v. Evergreen Sch. Dist. #114*,
56 F.4th 767 (9th Cir. 2022) ................................................................29

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
100 F.4th 1251 (10th Cir. 2024) ..........................................................28

## TABLE OF AUTHORITIES
(continued)

**Page**

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015)....................................................................................38

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) ......................................................................34

*Frazee v. Illinois Department of Employment Security*,
489 U.S. 829 (1989)....................................................................................26

*Groff v. DeJoy*,
600 U.S. 447 (2023)...............................................................................passim

*Harper v. Nedd*,
71 F.4th 1181 (9th Cir. 2023) ......................................................................21

*Heller v. EBB Auto. Co.*,
8 F.3d 1433 (9th Cir. 1993) .........................................................................36

*Higgins v. New Balance Athletic Shoe, Inc.*,
194 F.3d 252 (1st Cir. 1999).........................................................................37

*Hittle v. City of Stockton, Cal.*,
101 F.4th 1000 (9th Cir. 2024) .....................................................................42

*Hobbie v. Unemployment Appeals Commission of Florida*,
480 U.S. 136 (1987)....................................................................................26

*Hollis v. Chestnut Bend Homeowners Ass'n*,
760 F.3d 531 (6th Cir. 2014) .......................................................................37

*Hope v. Pelzer*,
536 U.S. 730 (2002)....................................................................................29

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905). OB 38–40 ..............................................................25, 26

**TABLE OF AUTHORITIES**
(continued)

**Page**

*James v. Gen. Dynamics Land Sys. Inc.*,
582 F. Supp. 3d 673 (D. Alaska 2022), *appeal dismissed sub nom. James v. Gen Dynamics Land Sys. Customer Serv. & Support Co.*,
2022 WL 3711379 (9th Cir. Mar. 30, 2022) ....................................................33

*Johnson v. Riverside Healthcare Sys., LP*,
534 F.3d 1116 (9th Cir. 2008) ........................................................................21

*Keene v. City & County of San Francisco*,
No. 22-16567, 2023 WL 3451687 (9th Cir. May 15, 2023) ............................27

*Kisela v. Hughes*,
584 U.S. 100 (2018)...................................................................................28, 29

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) ..........................................................................20

*Lavelle-Hayden v. Legacy Health*,
744 F. Supp. 3d 1135 (D. Or. 2024) ...............................................................32

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)..........................................................................................27

*Malley v. Briggs*,
475 U.S. 335 (1986)..........................................................................................23

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*,
584 U.S. 617 (2018)...................................................................................24, 25

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)...............................................................................35, 36, 37

*Melino v. Boston Med. Ctr.*,
127 F.4th 391 (1st Cir. 2025)...........................................................................44

*Mullenix v. Luna*,
577 U.S. 7 (2015)..............................................................................................23

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Okonowsky v. Garland*,
109 F.4th 1166 (9th Cir. 2024) ....................21

*Ortez v. Washington County, State of Or.*,
88 F.3d 804 (9th Cir. 1996) ....................20

*Pebbles v. Potter*,
354 F.3d 761 (8th Cir. 2004) ....................37

*Perdue v. Sanofi-Aventis U.S., LLC*,
999 F.3d 954 (4th Cir. 2021) ....................37

*Perez v. City of Fresno*,
98 F.4th 919 (9th Cir. 2024) ....................25

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004) ....................passim

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) ....................34

*Punt v. Kelly Servs.*,
862 F.3d 1040 (10th Cir. 2017) ....................37

*Ricci v. DeStefano*,
557 U.S. 557 (2009)....................32

*Rodrique v. Hearst Commc'ns, Inc.*,
126 F.4th 85 (1st Cir. 2025)....................44

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....................24

*Russell v. Lumitap*,
31 F.4th 729 (9th Cir. 2022) ....................28, 29

*Sanderlin v. Dwyer*,
116 F.4th 905 (9th Cir. 2024) ....................28, 29

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Saucier v. Katz*,
533 U.S. 194 (2001)....................19, 23

*Shafer v. County of Santa Barbara*,
868 F.3d 1110 (9th Cir. 2017)....................23

*Sherbert v. Verner*,
374 U.S. 398 (1963)....................26

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)....................36

*Sturgill v. Am. Red Cross*,
114 F.4th 803 (6th Cir. 2024)....................33

*Taylor v. Riojas*,
592 U.S. 7 (2020)....................29

*Thomas v. Nat'l Ass'n of Letter Carriers*,
225 F.3d 1149 (10th Cir. 2000)....................37

*Thomas v. Review Board of Indiana Employment Security Division*,
450 U.S. 707 (1981)....................26

*Tiano v. Dillard Dep't Stores, Inc.*,
139 F.3d 679 (9th Cir. 1998)....................35, 36

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
435 F.3d 989 (9th Cir. 2006)....................33

*White v. Pauly*,
580 U.S. 73 (2017)....................passim

*Wood v. City of San Diego*,
678 F.3d 1075 (9th Cir. 2012)....................32

*Wood v. Moss*,
572 U.S. 744 (2014)....................18, 22

## TABLE OF AUTHORITIES
(continued)

**Page**

### Statutes

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

42 U.S.C. § 1983 .......... passim

42 U.S.C. § 2000e .......... passim

42 U.S.C. § 2000e-2 .......... 34

Americans with Disabilities Act .......... 32, 37

Fair Housing Act .......... 37

Or. Rev. Stat. § 353.030 .......... 4, 7

### Rules

Fed. R. App. P. 4(a)(1)(A) .......... 1

Fed. R. Civ. P. 12(b)(6) .......... 20, 21

### Constitutional Provisions

U.S. Const. amend. I .......... passim

U.S. Const. amend. XIV .......... 21, 26

### Other Authorities

Or. Admin. R. 333-019-1010 (2021) .......... 9

Oregon Governor Kate Brown, Executive Order No. 21-29 .......... 9

## JURISDICTIONAL STATEMENT

Plaintiff Brittany K. MacDonald filed this action in the District of Oregon seeking relief under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). *See* 3-ER 517–58. The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under federal law.

The district court entered final judgment on July 9, 2024. 1-ER-2. MacDonald timely filed a notice of appeal on August 6, 2024. 3-ER 559–60; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

1. Are government officials entitled to qualified immunity where no authority—binding or otherwise—clearly establishes an unvaccinated nurse's right to continue working in close contact with vulnerable patient populations during a global pandemic when the nurse has failed to comply with the employer's mandatory vaccination policy?
2. Where an employer presents uncontroverted evidence that accommodating an employee would pose an undue hardship to the conduct of its business, is it entitled to summary judgment on the employee's Title VII failure-to-accommodate claim?

## INTRODUCTION

In March 2020, the SARS-CoV-2 virus plunged the world into the greatest public health crisis in a century. The United States saw surge after surge of infections—each seemingly larger than the last—as COVID-19 hospitalized and killed hundreds of thousands of Americans. In the summer of 2021, the Delta variant caused infections, hospitalizations, and deaths to skyrocket.

Oregon Health and Science University ("OHSU") worked on the front lines of the COVID-19 pandemic as sick patients flooded Oregon's hospitals. As a public institution charged by the state with providing high-quality and accessible healthcare to all Oregonians, OHSU had a duty to keep patients and the community safe from COVID-19 while maintaining its normal operations and patient services. Throughout the pandemic, OHSU did all it could to protect patients, healthcare workers, and the community. OHSU implemented policies for masking, testing, and social distancing throughout its facilities. And following the best available science and guidance from reputable public organizations indicating that vaccination was the single most effective tool for protecting individuals from COVID-19, OHSU implemented a mandatory COVID-19 vaccination policy that required all employees to be vaccinated against COVID-19 unless they received an approved medical or religious exception.

MacDonald worked as a registered nurse in OHSU's Doernbecher

Children's Hospital in the Mother Baby Unit ("MBU"). Her job required her to be in direct physical contact with recently pregnant mothers and newborns, who were especially vulnerable to developing severe or critical COVID-19. MacDonald applied for a religious exception, which was denied. OHSU determined that allowing her to continue working unvaccinated would impose significant medical, institutional, and operational risks. Accordingly, OHSU terminated her employment. MacDonald sued under 42 U.S.C. § 1983 and Title VII.

In this appeal, MacDonald contends that the district court erred by concluding that (1) the individual defendants she sued under § 1983 were entitled to qualified immunity; and (2) OHSU was not required to accommodate MacDonald because doing so would pose an undue hardship to the conduct of its business. Her arguments are meritless. OHSU and the individual appellees respectfully request that this Court affirm the district court's judgment.

## STATEMENT OF THE CASE

### I. Factual Background

The following facts are presented in the light most favorable to MacDonald, the non-moving party. *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014).

#### a. OHSU

OHSU is Oregon's largest public hospital system and its only public academic health institution. SER-77 ¶ 6. OHSU operates hospitals and clinics

across Oregon and southwest Washington. SER-77 ¶ 6. In 2021, OHSU employed roughly 20,000 employees, staffed approximately 562 beds, and cared for roughly 330,000 patients. SER-77–78 ¶ 6.

As a healthcare provider, OHSU has legal and ethical responsibilities to its patients. SER-78 ¶ 7. In addition to the Hippocratic Oath, which charges its providers to "do no harm," OHSU is ethically, morally, and professionally responsible for providing the best possible care. SER-78 ¶ 7. But OHSU's responsibilities go beyond those of ordinary providers. The Oregon legislature created and charged OHSU with a public mission to "serve the people of the State of Oregon" and "strive for excellence in education, research, clinical practice, scholarship and community service while maintaining compassion, personal and institutional integrity and leadership in carrying out its missions." Or. Rev. Stat. § 353.030(1)–(2); *see* SER-78 ¶ 8. OHSU's mission and purpose are to "[e]ngage in the provision of inpatient and outpatient clinical care and health care delivery systems throughout the state," "[s]erve as a local, regional and statewide resource for health care providers," and "[c]ontinue a commitment to provide health care to the underserved patient population of Oregon." Or. Rev. Stat. § 353.030(3)(c), (e), (f); *see* SER-78 ¶ 9. State law directs OHSU to "carry out the[se] public purposes and missions . . . in the manner that . . . best promotes the public welfare of the people of the State of Oregon." Or. Rev. Stat. § 353.030(4); *see* SER-78–79 ¶ 9.

### b. The COVID-19 Pandemic

COVID-19 is a disease caused by the virus SARS-CoV-2. SER-8 ¶ 15. It was first reported in late 2019 in Wuhan, China, and was declared a global pandemic in March 2020. SER-8–9 ¶ 15.

SARS-CoV-2 is transmitted via respiratory particles and droplets from symptomatic infected persons, but it can also spread asymptomatically. SER-10–11 ¶ 20. COVID-19 patients may experience symptoms including cough, shortness of breath, fever, and fatigue. SER-9–10. In more serious cases, COVID-19 can cause difficulty breathing, low oxygen levels, and pneumonia, which may require hospitalization, intensive care monitoring, and mechanical ventilation. SER-9–10 ¶ 19. In critical cases, COVID-19 can cause death. SER-9 ¶ 16. Although COVID-19 poses a risk to everyone, individuals over 65 or with medical comorbidities (including pregnancy or recent pregnancy, high blood pressure, diabetes, obesity, and cancer) are more likely to experience severe symptoms requiring hospitalization and intensive treatments. SER-9–10 ¶ 19.

Since the start of the pandemic, SARS-CoV-2 has evolved and mutated in ways that make it more transmissible or deadly. SER-9 ¶ 17. When mutations lead to enhanced transmission or altered clinical presentations, the mutated virus is termed a "variant of concern." SER-9 ¶ 17.

One such variant of concern, the Delta variant, became dominant in the United States in the summer of 2021. SER-9 ¶ 18. The Delta variant was more transmissible than previous variants and was associated with a significantly higher risk of severe disease and hospitalization. SER-9 ¶ 18. As the Delta variant surged between June and September 2021, COVID-19 cases skyrocketed by 1,200% and hospital admissions increased by up to 600% nationwide. SER-15 ¶ 29. Near Delta's peak, COVID-19 claimed 1,500 American lives per day. SER-15 ¶ 29. Risk of Delta transmission was especially high in hospitals, where healthcare workers and patients worked closely together in congregate settings. SER-16–17 ¶ 34; SER-46 ¶ 15.

#### c. OHSU's Response to COVID-19

OHSU resolved to do everything it could to prevent the spread of COVID-19 within its institution. SER-83 ¶ 24. Physicians and scientists in OHSU's Occupational Health Department helped OHSU develop policies for navigating the pandemic, following the most reliable science available and relying on guidance issued by reputable public organizations like the Centers for Disease Control and Prevention (CDC), the Centers for Medicare & Medicaid Services (CMS), the Federal Drug Administration (FDA), and the World Health Organization (WHO). SER-44, 47–48 ¶¶ 7, 19–20; SER-83–84 ¶¶ 24–25. These included policies for the use and allocation of protective resources, including personal protective equipment

(PPE), tests, and vaccines. SER-44, 49 ¶¶ 8–9, 22 (describing the specific policies OHSU adopted for the use of PPE, testing, social distancing, disinfection, and education). Each of these policies was designed to strike the optimal balance between maximizing protection against COVID-19 while also maximizing the quality and quantity of healthcare OHSU could provide. SER-50 ¶ 26.[1] OHSU incurred the costs of implementing these policies to fulfill its public mission and its unique responsibilities to Oregonians. SER-50 ¶¶ 23–25; *see, e.g.*, Or. Rev. Stat. § 353.030(4).

In 2021, a consensus of consistent and reliable data demonstrated that vaccination was the single most effective tool available for mitigating the spread of SARS-CoV-2 among healthcare workers and patients—and also prevented severe or critical COVID-19. SER-51 ¶¶ 29–30; SER-16–17 ¶ 34. Vaccination was fundamentally different from other measures (PPE, testing, social distancing, etc.) in that it provided innate immune system protection against COVID-19 that other protective measures could not provide. SER-55 ¶¶ 38–39; *see* SER-17–18 ¶ 37 ("Vaccines have the benefit of stimulating the immune system without interruption, regardless of setting or adherence to PPE."). Accordingly,

---

[1] For example, implementing stricter or more burdensome stay-at-home requirements or testing requirements would have done little to prevent the spread of COVID-19 but would have put significant additional strain on OHSU's already limited staffing resources. SER-50 ¶¶ 24, 26.

organizations like the CDC, CMS, FDA, and WHO advised that, to maximize protection against COVID-19, individuals should use a combination of *both* vaccination and other measures. SER-84 ¶ 27; SER-47–48 ¶¶ 19–20.

Vaccination protected against COVID-19 in at least three ways. SER-51 ¶ 30. First, vaccination significantly reduced the chance of infection after exposure. SER-52 ¶ 31. Data showed that COVID-19 vaccines were more than 94% effective in preventing infection in the general population, SER-11 ¶ 23, and that unvaccinated persons during the Delta surge in 2021 were three times more likely than vaccinated persons to be infected with SARS-CoV-2, regardless of age, race, and ethnicity, SER-13 ¶ 26; *see also* SER-52 ¶ 31. Data further showed that vaccination was at least 80% effective in preventing infection among frontline healthcare workers. SER-13 ¶ 26.

Second, the available science in 2021 indicated that, where vaccinated persons experienced the rare "breakthrough infection" (*i.e.*, where they became infected with COVID-19 notwithstanding vaccination), they generally would be less contagious than unvaccinated infected persons, and thus less likely to transmit SARS-CoV-2 to others. SER-52 ¶ 32; *see also* SER-12 ¶ 25. They would also be sick and contagious for shorter durations, and thus less likely to infect others over the course of their infection as compared to unvaccinated persons. SER-12 ¶ 25.

Third, data showed that vaccinated persons experiencing breakthrough

infections were significantly less likely to be sick for a long time, develop severe or critical COVID-19, suffer long-COVID symptoms, or become reinfected. SER-12, 14 ¶¶ 25, 28; SER-53 ¶ 33. Data specifically showed that being unvaccinated was associated with 2.3 times higher odds of reinfection compared to being fully vaccinated. SER-14 ¶ 28. These data were consistent with the ratios of vaccinated and unvaccinated patients hospitalized at OHSU for COVID-19; the number of unvaccinated patients hospitalized for COVID-19 consistently dwarfed the number of vaccinated hospitalized patients. *See* SER-53 ¶ 34 (providing respective patient counts).

Accordingly, as the Delta variant surged in the fall of 2021, Oregon Governor Kate Brown sought to limit the spread of COVID-19 in Oregon's healthcare facilities by issuing Executive Order No. 21-29, which created an emergency health regulation requiring all healthcare workers to be vaccinated against COVID-19 by October 18, 2021. *See* Or. Admin. R. 333-019-1010 (2021). In compliance with the Governor's rule, OHSU implemented the COVID-19 Immunizations and Education Policy ("Vaccination Policy"). SER-84–85 ¶ 28. The Vaccination Policy required all OHSU personnel to become fully vaccinated against COVID-19 by October 18, 2021, unless they had an approved medical or religious exception. SER-84–85 ¶¶ 28–29. All requests for religious exceptions were sent to the Vaccine Exception Review Committee ("VERC") for evaluation

and decision. SER-85 ¶ 29. The Vaccination Policy further provided that no unvaccinated OHSU employee would be permitted to engage in in-person patient care unless approved by OHSU's President or his designee. SER-87–91; SER-51 ¶ 28.

OHSU adopted the Vaccination Policy because it concluded that allowing unvaccinated healthcare workers to have in-person contact with patients would put both workers and patients at risk of contracting or spreading COVID-19, with potentially significant medical consequences. SER-86 ¶ 32; SER-54–55 ¶¶ 35–38; *see also* SER-15 ¶ 32 ("Based on the evidence above, a strategy involving healthcare workers who avoid vaccination in favor of natural immunity involves significant personal risk, in addition to risk to patients, with potentially significant medical consequences."). This would not only pose individual health risks, but it also threatened OHSU's ability to maintain operational capacity and provide essential services to the community, a crucial aspect of OHSU's public mission and societal responsibilities. SER-86 ¶ 32. And it would further undermine public trust in both OHSU and Oregon hospitals more broadly. *See* SER-86 ¶ 32; SER-16 ¶ 33.

Vaccinating all healthcare workers accomplished several goals, including: (1) protecting patients by making it less likely that employees would spread SARS-CoV-2 to patients; (2) protecting employees by decreasing their personal odds of

developing severe or critical COVID-19 and, further, reducing spread of SARS-CoV-2 between employees; (3) strengthening OHSU's overall workforce to ensure it could remain fully operational during the pandemic; (4) protecting the community by preventing outbreaks in the Portland metropolitan area; and (5) upholding OHSU's public mission to serve and protect Oregonians and instill public trust in Oregon healthcare. *See* SER-10–16, 18 ¶¶ 24–33, 38; SER-54–55 ¶¶ 35–37.

Despite utilizing all protective measures reasonably available, however, it was not possible for OHSU to entirely avoid SARS-CoV-2 transmission within its walls, especially considering that it was treating patients infected with COVID-19 throughout the pandemic. SER-57 ¶ 42. In total, OHSU's Occupational Health Department identified and responded to at least eight different in-hospital outbreaks during the summer and fall 2021. SER-57 ¶ 42. Given these intermittent transmissions that occurred notwithstanding the use of all available protective measures, OHSU reasonably concluded that scaling back *any* measure would predictably result in more in-hospital transmissions. SER-57 ¶¶ 43–44; *accord* SER-15–16 ¶¶ 32–33.

**d. MacDonald's Work in OHSU's MBU**

MacDonald worked as a registered nurse in the MBU. 3-ER-522 ¶ 18; SER-36 ¶ 22. The MBU provides intensive care services for recently pregnant mothers,

newborns, and a small number of other adult patients with special conditions. SER-33 ¶¶ 7–9. These patients are generally more vulnerable to developing severe or critical COVID-19 than the average adult. SER-33–34, 37 ¶¶ 7, 9–10, 12, 28; SER-9–10 ¶ 19.

Registered nurses in the MBU are responsible for providing direct care to MBU patients, which includes feeding, bathing, diapering, and administering medications to newborns and helping parents hold and breastfeed their babies. SER-34 ¶¶ 13, 14. This type of care requires nurses to be in direct physical contact with, or within very close physical proximity of, their patients. SER-34 ¶¶ 13, 14. Nurses must also respond to emergencies, which requires immediate attention and direct physical contact with patients. SER-34–35 ¶¶ 15–18. Like other MBU nurses, MacDonald provided all of this care to MBU patients. SER-36 ¶ 22. MacDonald worked exclusively in person and could not perform her job remotely. SER-36 ¶ 22.

Given the vulnerable patient population that the MBU serves, MBU nurses were required to employ all measures available to protect themselves and their patients from COVID-19. SER-39 ¶ 34. But some of these measures only went so far. Social distancing, for example, was virtually impossible in the MBU. SER-33, 37–38 ¶¶ 6, 29. As previously noted, nurses needed to be close to—and touch—the infants and mothers in their care. SER-33–35 ¶¶ 13–17. Nurses

likewise could not socially distance from coworkers and visitors while delivering needed care. SER-37–38 ¶¶ 29–30. And although managers made efforts to reduce visitors and staff in the MBU, the MBU remained regularly filled with people, making it impossible for those present in the MBU to socially distance from each other. SER-32–33 ¶¶ 5–6.

The MBU exemplified the staffing challenges COVID-19 posed to OHSU and other health systems. *See* SER-38 ¶ 31. Oregon was already experiencing a nursing shortage in 2021. *See* SER-38 ¶ 31. Because working in the MBU required special experience and training, nurses in other departments could not readily substitute for MBU nurses who contracted COVID-19. *See* SER-38 ¶ 31. Finding and hiring replacement MBU nurses in the event of illness was similarly difficult. *See* SER-35, 38 ¶¶ 18, 31–32.

#### e. MacDonald's Exception Request

On or around September 19, 2021, MacDonald submitted a religious exception request to OHSU's COVID-19 Vaccination Policy. 3-ER-523 ¶ 21; *see* 3-ER-540–47. OHSU determined that MacDonald did not qualify for a religious exception and denied her request. 3-ER-524 ¶ 24.[2] MacDonald nonetheless

[2] MacDonald incorrectly asserts that OHSU denied her exception request "because she held three sincere religious beliefs" that OHSU had purportedly "deemed unworthy of accommodation." OB 13 (citing to copies of MacDonald's religious exception request). In fact, the record contains no evidence explaining the specific reason why OHSU denied MacDonald's exception request.

declined to comply with the Vaccination Policy, and OHSU terminated her employment in December 2021. 3-ER-526 ¶ 31.

## II. Procedural History

MacDonald commenced this action on December 15, 2022, alleging that OHSU failed to accommodate her religious beliefs in violation of Title VII, and that two groups of individual defendants violated her First Amendment rights under 42 U.S.C. § 1983. *See* 3-ER-517–58. The first group of defendants included Wayne Monfries, Ruth Beyer, Mahtab Brar, James Carlson, Danny Jacobs, Susan King, Chad Paulson, Sue Steward, and Steve Zika (the "Board Defendants"), who MacDonald alleged were responsible for establishing policies and protocols aimed at ensuring the health and safety of OHSU's employees and patients during the COVID-19 pandemic. 1-ER-34; *see* 3-ER-519. The second group of defendants, Does 1–50 (the "VERC Defendants," and collectively with the Board Defendants, the "Individual Defendants"), consisted of members of OHSU's VERC who allegedly reviewed and evaluated requests for medical and religious exceptions. 1-ER-34; *see* 3-ER-519. MacDonald sought declaratory relief and economic, non-economic, and punitive damages. 3-ER-530–32.

OHSU moved to dismiss the complaint. 3-ER-477–516.[3] The district court granted the motion as to MacDonald's First Amendment claim. 1-ER-31–55. The court noted that "it is Plaintiff's burden to point to a case that shows that the [First Amendment] right [that she claimed] was clearly defined at the time of the alleged violation." 1-ER-50. Because MacDonald had not identified a case establishing that the denial of a religious accommodation under similar circumstances violated the First Amendment, the district court concluded that the Individual Defendants were entitled to qualified immunity. 1-ER-48, 54.

As to the Title VII claim, the court observed that OHSU took the position that allowing MacDonald to continue caring for vulnerable patients while unvaccinated during a global pandemic would have created an undue hardship. 1-ER-37. The court concluded that "on the limited record" before it at the pleading stage, OHSU had not demonstrated that accommodating MacDonald would have resulted in an undue hardship. 1-ER-45 (noting that "[o]n a more robust record, Defendants may very well be able to meet their burden" to show undue burden). The court therefore allowed MacDonald's Title VII claim to proceed. 1-ER-48.

[3] While OHSU's motion to dismiss was pending, the U.S. Supreme Court issued its decision in *Groff v. DeJoy*, 600 U.S. 447 (2023). The district court ordered, and the parties filed, a joint supplemental brief describing the effect of that case. *See* 2-ER-228–40.

MacDonald subsequently moved to amend her complaint to add a disparate-treatment claim predicated on intentional discrimination. *See* SER-119–20. OHSU's opposition argued (among other things) that amendment would be futile because MacDonald failed to exhaust her administrative remedies before the Equal Employment and Opportunity Commission (EEOC) with respect to any intentional-discrimination disparate-treatment claim, and that amendment when the parties were already months into their limited discovery on undue hardship would result in undue delay. *See* SER-102–17, 96–101. MacDonald withdrew her motion, *see* SER-93–95, and the district court dismissed it as moot, *see* SER-92.

Following discovery, OHSU moved for summary judgment, arguing that there was no genuine issue of material fact as to whether OHSU would suffer an undue burden by allowing MacDonald to continue working while unvaccinated. *See* 2-ER-187–227; SER-4–91.[4] OHSU's motion relied on the written testimony of Dr. Renee Edwards, Chief Medical Officer of OHSU Health; Dr. Seth Cohen, an expert in epidemiology and infectious disease; Dr. Marcel Curlin, an infectious disease specialist at OHSU and director of OHSU's Occupational Health Department in 2021; and Molly Blaser, MacDonald's supervisor in the unit where

[4] During discovery, MacDonald specified that accommodations she would accept involved "wear[ing] a mask, test[ing] daily, stay[ing] home if sick," "[w]earing additional [PPE] as required when taking care of patients with active COVID 19 symptoms," and "submit[ting] to all other health precautions that applied to all nurses, vaccinated or otherwise." SER-30.

she worked. *See* 2-ER-209.

The district court granted OHSU's motion. 1-ER-3–30. The court began by explaining that under *Groff v. DeJoy*, 600 U.S. 447 (2023), and other cases, "undue hardship is properly analyzed by considering both economic and non-economic costs, viewed at the time Defendant decided to deny Plaintiff's requested religious exemption and then terminate her employment for refusing to obtain the COVID-19 vaccine." 1-ER-13; *see also* 1-ER-4, 16. The court then reviewed the substantial evidence OHSU filed in support of its motion for summary judgment. 1-ER-16–23. It reasoned that "the evidence available to Defendant in 2021 established that patient-facing healthcare providers must receive the vaccine for myriad reasons: mitigating the spread of COVID-19; reducing the risk of developing severe or critical COVID-19; shortening the recovery time for breakthrough infections; and lowering the risk of reinfection." 1-ER-30. It further observed that "the conduct of Defendant's particular business includes its mission to protect the health and safety of its patients and its staff." *Id.* The court thus concluded that OHSU established that accommodating MacDonald would have posed an undue hardship. *Id.* Finally, the court explained that "much of Plaintiff's evidence" was inadmissible and that the remainder "fail[ed] to raise a genuine dispute of material fact as to Defendant's undue hardship determination." 1-ER-26; *see id.* at 1-ER-26–30. The court granted OHSU's motion for summary

judgment. 1-ER-30. This appeal followed.

## STATEMENT REGARDING ADDENDUM

Pertinent statutory provisions and rules appear in the Addendum to this brief.

## SUMMARY OF THE ARGUMENT

In an effort to win reversal, MacDonald lobs meritless arguments hoping to find one that will stick and attempts to persuade this Court that the law is other than it is. This Court should affirm the district court's careful and thorough decisions below.

**1.** The Individual Defendants are entitled to qualified immunity on MacDonald's First Amendment claims brought under 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Wood v. Moss*, 572 U.S. 744, 757 (2014) (citation omitted). To be "clearly established," "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and citation omitted). The U.S. Supreme Court has repeatedly stated that the clearly established inquiry "'must be undertaken in light of the specific context of the case, not as a broad general

proposition,'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), and that the clearly established law "must be 'particularized' to the facts of the case," *White*, 580 U.S. at 79.

MacDonald has not, and cannot, cite a case clearly establishing that a healthcare worker whose job requires exclusively in-person work and close physical contact with vulnerable patients has a First Amendment right to continue working even after refusing vaccination during a global pandemic. At most, the cases she cites stand for the uncontroversial proposition that individuals have a First Amendment right to freely exercise their religion. That general constitutional rule offers no guidance about the constitutionality of actions taken under the "particularized" facts of this case. The district court's dismissal of MacDonald's § 1983 claim should be affirmed.

**2.** As for her Title VII claim, MacDonald does not dispute in this appeal that accommodating her would have imposed undue hardship on OHSU. Nor does she take issue with the substantial, unrebutted evidence of undue hardship that OHSU presented below. MacDonald instead attempts to manufacture a factual dispute by distorting the law, insisting that OHSU's position that accommodating MacDonald would pose an undue hardship to the conduct of its business was in fact "a pretext to mask discriminatory motives." Opening Brief ("OB") 56. By doing so, MacDonald invites the Court to import a pretext element into the failure-to-

accommodate analysis. Accepting MacDonald's argument would require this Court to overlook (1) MacDonald's failure to allege a disparate-treatment claim in her complaint; (2) the fact that no court has held that an employer's intent is relevant to whether the employer complied with its legal obligation to reasonably accommodate an employee under Title VII; and (3) that even if a defendant's intent played a role in the reasonable-accommodation inquiry, MacDonald failed to raise a genuine issue of material fact as to pretext. The district court's conclusion that allowing MacDonald to continue working as a nurse in OHSU's MBU while unvaccinated would pose an undue hardship to the conduct of OHSU's business was correct and was supported by a landslide of undisputed evidence. That decision should be affirmed.

## ARGUMENT

### I. Standard of Review

This Court reviews *de novo* dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Ortez v. Washington County, State of Or.*, 88 F.3d 804, 807 (9th Cir. 1996). This Court "'accept[s] the complaint's well-pleaded factual allegations as true, and construe[s] all inferences in the plaintiff's favor[.]'" *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019) (quoting *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016)). "'[C]onclusory allegations of law and unwarranted inferences,'" however, "'are

insufficient to defeat a motion to dismiss.'" *Harper v. Nedd*, 71 F.4th 1181, 1184 (9th Cir. 2023) (quoting *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Ultimately, a complaint "must, at minimum, plead 'enough facts to state a claim for relief that is plausible on its face.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A Rule 12(b)(6) dismissal may be based on either a lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson*, 534 F.3d at 1121 (internal quotation marks and citation omitted).

This Court also reviews a district court's order granting summary judgment *de novo*. *Okonowsky v. Garland*, 109 F.4th 1166, 1178 (9th Cir. 2024). "[V]iewing the evidence in the light most favorable to the non-moving party, [the Court] must decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (internal quotation marks and citation omitted).

## II. MacDonald's First Amendment claims fail as a matter of law because she cannot show that the Individual Defendants violated any constitutional right that was clearly established at the time her religious exception request was denied.

MacDonald first insists that the Individual Defendants violated her constitutional right to freely exercise her religion. U.S. Const. amends. I, XIV; *see*

42 U.S.C. § 1983 (creating cause of action against state officials who violate constitutional rights). The district court dismissed this claim, concluding that MacDonald failed to establish that "the right to refuse a state-mandated vaccine by a healthcare worker who works in-person with vulnerable populations due to allegedly religious concerns about 'fetal cells' and 'bodily integrity or sanctity'" was clearly established at the time MacDonald's request for religious exception was denied. 1-ER-49. This Court should affirm.

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood*, 572 U.S. at 757 (citation omitted). To be "clearly established," "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (internal quotation marks and citation omitted); *see Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that *every reasonable official* would understand that what he is doing is unlawful." (emphasis added; internal quotation marks and citation omitted)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The U.S. Supreme Court has "repeatedly" admonished courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see Mullenix*, 577 U.S. at 12; *White*, 580 U.S. at 79; *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). The clearly established inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau*, 543 U.S. at 198 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In other words, "the clearly established law must be 'particularized' to the facts of the case." *White*, 580 U.S. at 79. Otherwise, plaintiffs "'would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted)).

Here, MacDonald has not demonstrated that in "the specific context of th[is] case," any right to continue working while unvaccinated was clearly established. *Brosseau*, 543 U.S. at 198. More specifically, she has not pointed to any clearly

established law showing that a hospital system violates the Constitution by terminating the employment of a healthcare professional who refused to receive a state-mandated vaccine during a global pandemic, and whose job required her to provide intensive, in-person medical care to vulnerable populations. At most, the cases MacDonald cites stand for the uncontested and uncontroversial proposition that individuals have a right to the free exercise of religion. *See, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 535–36 (1993) (holding that city ordinance prohibiting ritual animal sacrifice but allowing nearly all other killings of animals acted as a "religious gerrymander," impermissibly targeting petitioners and their religious practices); *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 634–38 (2018) (holding that state civil rights commission violated the Free Exercise Clause by exhibiting "impermissible hostility toward . . . sincere religious beliefs" by, for example, comparing the petitioner's "invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust" when it concluded that state law required petitioner to create cakes for same-sex weddings); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17–18 (2020) (concluding that applicants showed their First Amendment claims were likely to prevail on the merits where state regulations "single out houses of worship for especially harsh treatment"). These cases offer no guidance about the constitutionality of actions taken under the

"'particularized'" facts present here, where the Delta variant of SARS-CoV-2 was surging, SER-15 ¶ 29; COVID-19 infections and related hospitalizations were skyrocketing, SER-15 ¶ 29; the best, most reliable data available demonstrated that vaccination was the single most effective tool for mitigating the spread of SARS-CoV-2 among healthcare workers and patients, SER-51 ¶¶ 29–30; SER-16–17 ¶ 34; reputable public entities like the CDC, CMS, FDA, and WHO advised that to maximize protection against COVID-19, individuals should use a combination of *both* vaccination and other measures, SER-84 ¶ 27; SER-47–48 ¶¶ 19–20; the Governor had issued a statewide mandate for healthcare workers to be vaccinated against COVID-19 by October 18, 2021, 3-ER-486; and MacDonald performed work at OHSU that required exclusively in-person care involving close contact with patients, SER-33–36 ¶¶ 13–17, 22. *See White*, 580 U.S. at 79 (citing *Anderson*, 483 U.S. at 640).[5]

MacDonald next relies on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

---

[5] MacDonald acknowledges that *Church of Lukumi Babalu Aye* and *Masterpiece Cakeshop* "articulate general constitutional principles." OB 26. Of course, articulation of a "broad general proposition" is insufficient to clearly establish law for purposes of qualified immunity. *Brosseau*, 543 U.S. at 198 (internal quotation marks and citation omitted). Moreover, this Court has observed that "[i]t is insufficient for a legal principle to merely be 'suggested by then-existing precedent.'" *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (quoting *Wesby*, 583 U.S. at 63). Rather, "'[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *Wesby*, 583 U.S. at 63). *Church of Lukumi Babalu Aye* and *Masterpiece Cakeshop* provide no such clarity.

OB 38–40. In *Jacobson*, the U.S. Supreme Court considered whether a state smallpox vaccination mandate comported with the Fourteenth Amendment. *Id.* at 12–14. The Court concluded that it did. *Id.* at 32. The Court reasoned that "the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26; *see id.* (recognizing that "persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state"). If anything, *Jacobson* clearly establishes a state's power to mandate vaccination. It does not and cannot clearly establish an individual's right to refuse to comply with an employer's vaccination requirement—much less as applied to a healthcare worker providing exclusively in-person medical care in the midst of a global pandemic.

As the district court correctly recognized, other cases on which MacDonald relies "either arise under different factual contexts or involve the alleged violation of different rights from those" MacDonald claims. 1-ER-50. For example, MacDonald invokes *Sherbert v. Verner*, 374 U.S. 398 (1963), *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707 (1981), *Hobbie v. Unemployment Appeals Commission of Florida*, 480 U.S. 136 (1987), and *Frazee v. Illinois Department of Employment Security*, 489 U.S. 829 (1989), which

involve the denial of unemployment benefits. The cases do not address an employer's decision to enact a vaccination policy during a global pandemic nor its decision not to issue a religious exception under circumstances similar to those present here. These cases therefore cannot clearly establish that any right was violated in the "specific context" at issue here. *Brosseau*, 543 U.S. at 198 (internal quotation marks and citation omitted).[6]

MacDonald also cites a hodgepodge of decisions (including unpublished opinions, memorandum orders, and out-of-circuit authorities) that were decided long after the Board Defendants allegedly established the relevant policies and protocols to ensure the health and safety of OHSU employees and patients during the height of the COVID-19 pandemic in September 2021, 3-ER-521 ¶ 16, 3-ER-551, and the VERC Defendants evaluated and denied MacDonald's exception request in or about October 2021, 3-ER-549. *See* OB 24–25, 36–37 (citing *Ariz. v. Mayorkas*, 143 S. Ct. 1312 (Mem.) (May 18, 2023) (statement of Gorsuch, J.), *Keene v. City & County of San Francisco*, No. 22-16567, 2023 WL 3451687 (9th

---

[6] The same is true of *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), which considered whether a requirement that closely held corporations provide health insurance coverage for certain methods of contraception violated a federal statute but declined to address or decide whether that requirement violated the First Amendment, *see id.* at 736, and *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020), which addressed whether federal agencies could craft regulatory exemptions to a statutory requirement that employers provide contraceptive coverage to their employees, *id.* at 663. Neither case remotely involves the same factual or legal context at issue here.

Cir. May 15, 2023); *Bacon v. Woodward*, 104 F.4th 744 (9th Cir. 2024); and *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251 (10th Cir. 2024)). The U.S. Supreme Court and this Court have made clear that "judicial decisions that d[id] not yet exist" at the time of the challenged action are "'of no use in the clearly established inquiry.'" *Kisela v. Hughes*, 584 U.S. 100, 107 (2018) (quoting *Brosseau*, 543 U.S. at 200 n.4 (per curiam)); *Sanderlin v. Dwyer*, 116 F.4th 905, 916 (9th Cir. 2024) ("The 'clearly established' inquiry that we undertake when evaluating an officer's assertion of qualified immunity is bound up with the precept of notice—notice means *prior* notice, not notice after the fact. For that reason, a court may not rely on subsequent legal developments favorable to the plaintiff to clearly establish the law, because the officer cannot fairly be said to know that the law forbade conduct not previously identified as unlawful." (citations and internal quotation marks omitted)); *Russell v. Lumitap*, 31 F.4th 729, 737 (9th Cir. 2022) ("[C]ases decided after the alleged constitutional violation cannot create clearly established law . . . because reasonable officers are not required to foresee judicial decisions that do not yet exist in instances where the [constitutional] requirements . . . are far from obvious." (internal quotation marks and citations omitted)). Accordingly, these cases do not help MacDonald.

Finally, MacDonald accuses the district court of "all but ignor[ing] this Court's instruction . . . that 'a general constitutional rule already identified in the

decisional law may apply with obvious clarity to the specific action in question.'" OB 23 (quoting *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 784 (9th Cir. 2022)) (emphasis omitted). The district court did not "ignore" this principle; the court addressed it head-on.[7] The court "recognize[d] that government actors may still be on notice that their conduct violates established law in novel factual circumstances in obvious or egregious cases," citing the U.S. Supreme Court cases that established this "obviousness" rule. 1-ER-53 (citing *Taylor v. Riojas*, 592 U.S. 7 (2020), and *Hope v. Pelzer*, 536 U.S. 730 (2002)). The court concluded, however, that "[t]his is not such an obvious or egregious case where, notwithstanding the lack of judicial guidance, the [Individual Defendants'] conduct was so clearly violative of a constitutional right that they should have known their actions were unconstitutional." *Id.* MacDonald offers no reason to revisit that decision, which was correct as a matter of law.

MacDonald has not established that any right to continue working with vulnerable patient populations while unvaccinated during a global pandemic was clearly established at the time her request for religious exception was denied.

[7] Regardless, *Dodge*, like other cases MacDonald cites, was decided long after the events of this case took place and cannot "clearly establish" any relevant law. *Kisela*, 584 U.S. at 107; *Sanderlin*, 116 F.4th at 916; *Russell*, 31 F.4th at 737.

Accordingly, this Court should affirm the district court's dismissal of her First Amendment claims.

### III. MacDonald failed to raise a triable issue of fact as to her Title VII failure-to-accommodate claim.

MacDonald does not dispute in this appeal that accommodating her would have imposed undue hardship on OHSU. Instead, she asserts that summary judgment was improper because, in her view, OHSU's position that allowing MacDonald to work with vulnerable patients while unvaccinated would have posed an undue hardship to the conduct of its business was in fact "a pretext to mask discriminatory motives." OB 56; *see id.* 17 (arguing that "an employee's showing of pretext can overcome an employer's showing of undue hardship"), 51 (asserting that "[a] plaintiff can overcome an employer's showing of undue hardship with specific, substantial evidence of pretext" (internal quotation marks omitted)). MacDonald, in other words, seeks to import a pretext or discriminatory-motive element into Title VII's failure-to-accommodate analysis.

Her argument fails for three reasons. First, MacDonald's new position is a bald attempt to circumvent her failure to assert a disparate-treatment claim premised on intentional discrimination in her complaint. Second, no court has held that an employer's intent is relevant to whether the employer comported with its legal obligation to reasonably accommodate an employee under Title VII. Third, even if a defendant's intent played a role in the reasonable-accommodation

inquiry, MacDonald has failed to raise a genuine issue of material fact suggesting that OHSU's decision not to accommodate her was pretextual.

### A. MacDonald's complaint raised a failure-to-accommodate claim, not an intentional-discrimination disparate-treatment claim.

In her complaint, MacDonald brought a single claim under Title VII. She asserted that OHSU "made no attempt to accommodate Plaintiff's bona fide religious beliefs, as Title VII requires." ER-527 ¶ 45; *see* ER 526 (MacDonald's "First Cause of Action" is entitled "Violation of Title VII – Failure to Accommodate"); *see also* OB 14–15 ("[MacDonald's] complaint included just two claims – one against the University *for failure to accommodate her sincerely held religious beliefs* in violation of Title VII, the other against the OHSU Officials under 42 U.S.C. § 1983 for violating her constitutionally protected freedom of religion." (emphasis added)). MacDonald therefore put Defendant on notice that it needed to adduce evidence concerning the elements of a failure-to-accommodate theory and the undue hardship defense, not the "entirely different defenses" needed to defeat a disparate-treatment claim predicated on a theory of intentional discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the

evidence it needs to adduce in order to defend against the plaintiff's allegations" and "theor[ies] of liability.").[8]

The procedural history of this case demonstrates that MacDonald has not raised an intentional-discrimination disparate-treatment claim. MacDonald moved to amend her complaint to add such a claim. *See* SER-119–20. OHSU opposed the motion, pointing out (among other things) that amendment would be futile because MacDonald failed to raise any disparate-treatment claim based on intentional discrimination before the EEOC and had therefore failed to exhaust administrative remedies. SER-102–17, 96–101; *see generally Crowe v. Wormuth*, 74 F.4th 1011, 1023 (9th Cir. 2023); *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1150 n.7 (D. Or. 2024) (noting that in the context of the Americans with Disabilities Act, "courts have held that raising one theory [*e.g.,* reasonable accommodation] but not the other [*e.g.*, disparate treatment] during the administrative exhaustion process forfeits the unraised theory in subsequent federal court proceedings"). MacDonald subsequently withdrew her motion, *see* SER-93–

[8] A plaintiff alleging a disparate treatment claim predicated on intentional discrimination asserts that his employer treated him less favorably than others because of a protected trait. *See Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012). Such a theory requires establishing, among other things, "'that the defendant had a discriminatory intent or motive for taking a job-related action.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). The elements of disparate-treatment claims predicated on such a theory, as distinguished from a failure-to-accommodate theory, are discussed in more detail in the section that follows.

95, and the district court dismissed it as moot, *see* SER-92. Accordingly, there was no disparate-treatment claim predicated on intentional discrimination before the district court, and there is no such claim before this Court. *See Sturgill v. Am. Red Cross*, 114 F.4th 803, 811 (6th Cir. 2024) (distinguishing between "failure to accommodate" and "disparate treatment" claims under Title VII, reasoning that "[i]f plaintiff wanted to plead a disparate-treatment claim independent of her accommodation claim, she could have done so," and concluding that the complaint "set[] forth only a claim for failure to accommodate"); *cf. Bodett v. CoxCom, Inc.*, 366 F.3d 736, 748–49 (9th Cir. 2004) (affirming grant of summary judgment with respect to intentional-discrimination disparate-treatment claim and concluding that because the plaintiff "did not raise a failure to accommodate theory, that ground is waived").

MacDonald cannot, at this late stage, bootstrap facts allegedly supporting a discriminatory motive and thus "maintain a new theory of liability to avoid summary judgment that was not adequately presented in the operative complaint." *James v. Gen. Dynamics Land Sys. Inc.*, 582 F. Supp. 3d 673, 680 (D. Alaska 2022), *appeal dismissed sub nom. James v. Gen Dynamics Land Sys. Customer Serv. & Support Co.*, 2022 WL 3711379 (9th Cir. Mar. 30, 2022). "'[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.'" *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)

(citation omitted); *see Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (disallowing a party from raising a new theory of liability at summary judgment that was not adequately pleaded in the original complaint). To permit MacDonald to raise a new theory of liability at the summary judgment stage "would be to expect [Defendant] to act as [a] mind reader[] and foresee all possible unalleged claims that *may* fall under a complaint." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1073 (9th Cir. 2023). Again, no intentional-discrimination disparate-treatment claim was properly before the district court and an employer's motive is not germane to the reasonable-accommodation claim that was before the district court and is now on appeal. *See* 1-ER-12 (observing that MacDonald moved to amend her complaint to add an intentional discrimination claim but subsequently withdrew that motion).

### B. Unlike disparate-treatment claims predicated on intentional discrimination, failure-to-accommodate claims do not require delving into a defendant's motives.

"Title VII makes it unlawful for an employer 'to discharge any individual . . . because of such individual's . . . religion[.]'" *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Title VII defines 'religion' to include 'all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or

practice without undue hardship on the conduct of the employer's business.'" *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998) (quoting 42 U.S.C. § 2000e(j)).

"A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate." *Peterson*, 358 F.3d at 603. Disparate-treatment claims predicated on intentional discrimination are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Peterson*, 358 F.3d at 603. Under this approach, a plaintiff "must first establish a *prima facie* case of disparate treatment," *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004), which requires the plaintiff to show "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603; *see Bodett*, 366 F.3d at 743 (noting that a prima facie case of intentional discrimination generally requires "present[ing] evidence of 'actions taken by the employer from which one can infer . . . that it is more likely than not that such action was based upon . . . [an] impermissible criterion'" (citation omitted)). If the plaintiff makes such a showing, "the burden shifts to the

defendant to produce some evidence demonstrating a legitimate, nondiscriminatory reason for the employee's termination." *Bodett*, 366 F.3d at 743 (citing *McDonnell Douglas*, 411 U.S. at 802). "If the defendant meets this burden of production, any presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason for termination was merely a pretext for discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993)).

Failure-to-accommodate claims under Title VII are analyzed under a different framework. To establish an employer's failure to accommodate, a plaintiff must first "set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson*, 358 F.3d at 606 (citing *Heller v. EBB Auto. Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). If the plaintiff makes out a prima facie case, "the burden then shifts to [the employer] to show that it 'initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" *Id.* (quoting *Tiano*, 139 F.3d at 681). Thus, unlike the three-step *McDonnell Douglas* test, the failure-to-accommodate analysis involves just two.

And unlike the intentional discrimination disparate-treatment inquiry, the failure-to-accommodate inquiry does not involve interrogating the defendant's motives. *Id*.

MacDonald now attempts to inject a "pretext" inquiry into this Court's reasonable-accommodation analysis.[9] In other words, MacDonald seeks to turn well-established Title VII precedent on its head by ignoring the unambiguous law cited above. She cannot point to a single case holding that "pretext" (or animus or a defendant's intent writ large) is an element, or even a proper consideration, in the context of reasonable-accommodation claims under Title VII.[10] Instead, MacDonald repeatedly invokes authority from the intentional-discrimination

[9] Other circuits have held that *McDonnell Douglas*'s three-step framework (which includes a pretext inquiry) does not apply to accommodation claims brought under the Americans with Disabilities Act ("ADA") and Fair Housing Act ("FHA"). *See, e.g.*, *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021) (declining to apply *McDonnell Douglas* to ADA accommodation claim); *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) (same); *Pebbles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004) (same); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (same); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (same); *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 540 (6th Cir. 2014) (declining to apply *McDonnell Douglas* to FHA accommodation claim); *see also Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (noting similarities between ADA disability accommodation framework and Title VII religious accommodation framework).

[10] MacDonald cites only an unpublished district court case from 2005 that asserts, without analysis or explanation, that an employer's showing of undue hardship can be overcome "with specific, substantial evidence of pretext." OB 51 (quoting *Bannister v. Bd. of Trs.*, No. 03-0094-E-BLW, 2005 WL 8165506, at *4 (D. Idaho Jan. 18, 2005)). That statement of law is erroneous and not endorsed by any Ninth Circuit case, including *Peterson*.

disparate-treatment context to bolster her erroneous argument that an employer's intent is germane to deciding whether the employer could reasonably accommodate an employee without imposing an undue hardship. *See, e.g.*, OB 50 (citing *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015), a disparate-treatment case, for the proposition that "in Title VII failure-to-accommodate cases, employers' motives matter").[11]

Aside from citing inapposite caselaw, MacDonald attempts to bolster her argument by distorting language in *Groff*, 600 U.S. 447. MacDonald cites *Groff* for the proposition that "hardship stemming from 'animosity to a particular religion, to religion in general, or to the very notion of accommodating a religious practice cannot be considered "undue."'" OB 16–17 (citing *Groff*, 600 U.S. at 472); *see also id.* 49 (citing *Groff* for the proposition that "[t]he 'undue hardship' cannot come from hostility toward accommodating a specific religious belief"). But *Groff*'s pronouncement about animosity was far more measured. In the section

[11] *E.E.O.C.* confronted the question whether under Title VII an employer could refuse to hire an applicant to avoid accommodating a religious practice that it could accommodate without undue hardship. *E.E.O.C.*, 575 U.S. at 770. In other words, the question whether the employer could have accommodated the applicant without undue hardship was undisputed—it could have. The question before the Court was instead whether trying to avoid providing such an accommodation was a permissible *motive* for denying an application for employment. *See id.* at 773 (holding that under Title VII, "[a]n employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions"). Thus, the claim at issue in *E.E.O.C.* was a "'disparate treatment' (or 'intentional discrimination')" claim. *Id.* at 771.

of the opinion on which MacDonald relies, the Court observed that "both parties agree that the language of Title VII requires an assessment of a possible accommodation's effect on 'the conduct of the employer's business.'" *Groff*, 600 U.S. at 472 (quoting 42 U.S.C. § 2000e(j)). The Court noted that "an accommodation's effect on [an employee's] co-workers may have ramifications for the conduct of the employer's business." *Id.* Of course, "a coworker's dislike of religious practice and expression in the workplace or the mere fact of an accommodation" cannot establish undue hardship. *Id.* (alterations, citation, and internal quotation marks omitted). Put simply, "a hardship that is attributable to *employee* animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Id.* (emphasis added). This concept—that employees' discomfort or animosity toward religion cannot create an undue hardship—is not a novel one in this circuit. *See Peterson*, 358 F.3d at 607–08 (explaining that "accommodating an employee's religious beliefs" cannot "create[] undue hardship for an employer merely because the employee's co-workers find his conduct irritating or unwelcome," observing that "[c]omplete harmony in the workplace is not an objective of Title VII").

Thus, *Groff* and this Court's existing precedent make clear that an employer cannot cite *other employees'* animus toward a colleague's religious beliefs when seeking to demonstrate that accommodation would create an undue hardship for

the employer. *Groff* does not stand for the proposition that courts must inquire into an *employer*'s motivations when assessing whether the employer could reasonably accommodate an employee without undue hardship. Were that the case, *Groff* would throw into question decades of this Court's precedents, under which the reasonable-accommodation analysis (unlike the analysis of disparate-treatment claims predicated on intentional discrimination) does not require inquiry into an employer's motives. *See, e.g.*, *Peterson*, 358 F.3d at 606–08 (analyzing failure-to-accommodate claim without consideration of employer's motive); *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (same).

Accordingly, even if MacDonald could demonstrate a genuine dispute of fact concerning OHSU's intent (which she cannot for the reasons discussed in the section that follows), any such dispute would not be material to the only claim that remains. *See* 1-ER-11–12 (observing that any "allegedly discriminatory motives are not material to [MacDonald's] Title VII claim for failure to accommodate, and so any related disputes of fact do not preclude summary judgment here"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

### C. Regardless, MacDonald fails to raise a genuine issue of material fact concerning OHSU's intent.

Aside from the fact that pretext has no place in the reasonable-accommodation inquiry (and is therefore not "material"), the meager "evidence" of pretext that MacDonald points to is insufficient to create a genuine issue for trial. More specifically, there is insufficient evidence to create a genuine dispute that OHSU's decision that it would suffer undue hardship by accommodating MacDonald was motivated by religious animus. In the district court, MacDonald pointed only to: (1) the granting of a religious exception for a member of the custodial staff who worked in the MBU who "shared similar beliefs"; and (2) OHSU's guidance regarding justifications it determined did not qualify for a religious exception. *See* 1-ER-12 n.1. OHSU's decision to *grant* a religious exception to an individual with "similar beliefs" cannot provide evidence that OHSU harbored animus toward MacDonald's religious beliefs, much less create a genuine issue of material fact. To the contrary, OHSU's accommodation of religious beliefs is evidence of its good faith efforts to accommodate sincerely held religious beliefs—which MacDonald elsewhere acknowledges. *See* OB 10 (conceding that "to its credit," OHSU accommodated MacDonald's religious preference not to participate in performing abortions).

As the district court correctly noted, OHSU's guidance regarding beliefs that did not qualify for a religious exception cannot "support[] an inference that

[MacDonald] was subject to religious animus." 1-ER-12 n.1. MacDonald identified no evidence in the record of the specific reasons decisionmakers at OHSU denied MacDonald's request, nor did she introduce evidence of how these decisionmakers applied OHSU's guidance when it denied her exception request. MacDonald merely assumes that OHSU denied her request because her objection to vaccination involved beliefs about abortion. But as OHSU discussed in its motion to dismiss, MacDonald's request also bore multiple indicia of insincerity which justified the denial of her request. 3-ER-511–13. MacDonald did not (and does not) argue that denying her request for those reasons would have been pretextual.

Moreover, even if MacDonald were correct that OHSU's guidance suggested that it would reject religious exception requests that were based on the use of fetal cells in the vaccines' testing or development (which OHSU does not concede), that guidance does nothing to call into question the considerable evidence demonstrating that allowing MacDonald to continue working while unvaccinated would pose an undue hardship to OHSU. *See generally Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088–89 (9th Cir. 2008) (noting that "[s]ummary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor"); *Hittle v. City of Stockton, Cal.*, 101 F.4th 1000, 1017 (9th

Cir. 2024) (explaining that defendant's "articulat[ion of] an overwhelming number of . . . non-discriminatory reasons for terminating [the plaintiff's] employment" defeated plaintiff's attempt to manufacture a triable issue of fact).[12] In other words, no reasonable juror could look at the evidence and conclude that the burden that OHSU faced by accommodating MacDonald—namely, the significant medical consequences attendant to allowing an unvaccinated healthcare worker to continue working in close physical contact with vulnerable patient populations during a global pandemic, *see* SER-86 ¶ 32; SER-54–55 ¶¶ 35–38; SER-15 ¶ 32, in addition to the operational and institutional consequences and the significant threat accommodation could pose to OHSU's ability to meet its mission, *see* SER-86

[12] For the first time on appeal, MacDonald points to other evidence that she believes should defeat summary judgment. She invokes news media reports that she contends illustrate that "hospitals throughout Oregon were understaffed and overflowing with COVID-10 [sic] patients." OB 53. Setting aside the admissibility problems inherent in relying on newspaper articles (which the district court recognized, *see* 1-ER-9), the articles do not speak to the situation at OHSU nor to OHSU's intent. They therefore cannot create a factual dispute for trial. MacDonald also points to her own declaration in which she contends that in the early months of the pandemic, OHSU stored PPE in a secure location. *See* 2-ER-95. In MacDonald's view, that decision demonstrated that OHSU "did not care about our needs on the floor." OB 52 (quoting 2-ER-95). Even if true (which OHSU does not concede), MacDonald's assertion says nothing about OHSU's intent with respect to its decision to deny MacDonald's requested accommodation. It is thus insufficient to create a genuine issue of material fact for trial. Finally, MacDonald insists, without citation, that "firing MacDonald perhaps created even bigger staffing issues in an all-hands-on-deck public health emergency." OB 53. Such conclusory statements unmoored from the factual record "are insufficient to defeat [a] . . . summary judgment motion." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

¶ 32, and to the public's trust in hospitals like OHSU, *see* SER-86 ¶ 32; SER-16 ¶ 33—was in reality a foil for religious animus. *See generally Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025) (affirming grant of summary judgment on undue hardship where "the record demonstrate[d] that [defendant] relied 'on the objective, scientific information available to [it],' with particular attention to 'the views of public health authorities'" (quoting *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998))); *Melino v. Boston Med. Ctr.*, 127 F.4th 391, 397–98 (1st Cir. 2025) (affirming grant of summary judgment against a nurse who sought to continue working in the intensive care unit without being vaccinated against COVID-19, noting that it was uncontroverted that the hospital implemented its vaccine requirement in part based on "CDC's recommendations, which describe vaccines as mitigating the effects and spread of COVID-19"). MacDonald's suggestion that it was should be rejected.

## CONCLUSION

For the foregoing reasons, OHSU and the Individual Defendants respectfully ask this Court to affirm.

DATED: March 31, 2025

STOEL RIVES LLP

*s/ Brenda K. Baumgart*
BRENDA K. BAUMGART
ALEX VAN RYSSELBERGHE
WHITNEY A. BROWN
*Counsel for Defendants-Appellees*

## STATEMENT OF RELATED CASES

The undersigned counsel is not aware of any related case. *See* Ninth Circuit Rule 28-2.6.

DATED: March 31, 2025

STOEL RIVES LLP

*s/ Brenda K. Baumgart*
BRENDA K. BAUMGART
ALEX VAN RYSSELBERGHE
WHITNEY A. BROWN

*Counsel for Defendants-Appellees*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-4852

I am the attorney or self-represented party.

**This brief contains** 10,234 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Brenda K. Baumgart **Date** 3/31/25

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED: March 31, 2025

STOEL RIVES LLP

*/s/ Brenda K. Baumgart*

BRENDA K. BAUMGART
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

Attorneys for Appellees

# ADDENDUM

# TABLE OF CONTENTS TO ADDENDUM

**U.S. Constitutional Provisions**

U.S. Const. amend. I .......... A-1

**Federal Statutes**

42 U.S.C. § 1983 .......... A-2

42 U.S.C. § 2000e .......... A-3

42 U.S.C. § 2000e-2 .......... A-4

**State Administrative Rules**

OAR 333-019-1010 (2021) .......... A-5

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**42 U.S.C. § 1983. Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**42 U.S.C. § 2000e. Definitions**

. . .

**(j)** The term “religion” includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee’s or prospective employee’s religious observance or practice without undue hardship on the conduct of the employer’s business.

. . .

## 42 U.S.C. § 2000e-2. Unlawful employment practices

### (a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . .

**OAR 333-019-1010 (2021). COVID-19 Vaccination Requirement for Healthcare Providers and Healthcare Staff in Healthcare Settings**

Temporary action effective 09/01/2021 through 01/31/2022.

(1) It is vital to this state that healthcare providers and healthcare staff be vaccinated against COVID-19. COVID-19 undergoes frequent mutations as it replicates, which over time has resulted in variants that are more transmissible or cause more severe disease. As of the time this rule was adopted, Delta was the variant making up more than 98 percent of sequenced specimens in Oregon. The Delta variant is approximately two to three times more infectious than early wild-type COVID-19 variants. There is emerging evidence that people infected with the Delta variant have similar viral loads regardless of vaccination status suggesting that even vaccine breakthrough cases may transmit this variant effectively. Being vaccinated, is therefore critical to prevent spread of Delta. Healthcare providers and healthcare staff have contact with multiple patients over the course of a typical day and week, including providers that provide care for people in their homes. Individuals cared for in these settings are more likely than the general public to have conditions that put them at risk for complications due to COVID-19. COVID-19 variants are running through the state's unvaccinated population and causing an increase in breakthrough cases for those who are fully vaccinated. This rule is necessary to help control COVID-19, protect patients, and to protect the state's healthcare workforce.

(2) For purposes of this rule, the following definitions apply:

(a) "Contractor" means a person who has healthcare providers or healthcare staff on contract to provide services in healthcare settings in Oregon.

(b) "COVID-19" means a disease caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

(c) "Fully vaccinated" means having received both doses of a two-dose COVID-19 vaccine or one dose of a single-dose COVID-19 vaccine and at least 14 days have passed since the individual's final dose of COVID-19 vaccine.

(d) "Healthcare providers and healthcare staff":

(A) Means individuals, paid and unpaid, working, learning, studying, assisting, observing or volunteering in a healthcare setting providing direct patient or resident care or who have the potential for direct or indirect exposure to patients, residents, or infectious materials, and includes but is not limited to any individual licensed by a health regulatory board as that is defined in ORS 676.160, unlicensed caregivers, and any clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, student and volunteer personnel.

(B) Does not mean parents, family members, guardians or foster parents residing in the home and providing care to a child or foster child in the home.

(e) "Healthcare setting":

(A) Means any place where health care, including physical or behavioral health care is delivered and includes, but is not limited to any health care facility or agency licensed under ORS chapter 441 or 443, such as hospitals, ambulatory surgical centers, birthing centers, special inpatient care facilities, long-term acute care facilities, inpatient rehabilitation facilities, inpatient hospice facilities, nursing facilities, assisted living facilities, residential facilities, residential behavioral health facilities, adult foster homes, group homes, pharmacies, hospice, vehicles or temporary sites where health care is delivered (for example, mobile clinics, ambulances), and outpatient facilities, such as dialysis centers, health care provider offices, behavioral health care offices, urgent care centers, counseling offices, offices that provide complementary and alternative medicine such as acupuncture, homeopathy, naturopathy, chiropractic and osteopathic medicine, and other specialty centers.

(B) Does not include any setting described in paragraph (A) of this subsection where the responsible party is a part of state government as that is defined in ORS 174.111.

(C) Does not include a person's private home if the home is not otherwise licensed, registered or certified as a facility or home listed in paragraph (A) of this subsection.

(f) "Medical exception" means that an individual has a physical or mental impairment that prevents the individual from receiving a COVID-19 vaccination.

(g) "Religious exception" means that an individual has a sincerely held religious belief that prevents the individual from receiving a COVID-19 vaccination.

(h) "Proof of vaccination" means documentation provided by a tribal, federal, state or local government, or a health care provider, that includes an individual's name, date of birth, type of COVID-19 vaccination given, date or dates given, depending on whether it is a one-dose or two-dose vaccine, and the name/location of the health care provider or site where the vaccine was administered. Documentation may include but is not limited to a COVID-19 vaccination record card or a copy or digital picture of the vaccination record card, or a print-out from the Oregon Health Authority's immunization registry.

(i) "Responsible party" means a person or persons who have control or responsibility for the activities of healthcare providers or healthcare staff in a healthcare setting.

(3) After October 18, 2021:

(a) A health care provider or healthcare staff person may not work, learn, study, assist, observe, or volunteer in a healthcare setting unless they are fully vaccinated or have provided documentation of a medical or religious exception.

(b) An employer of healthcare providers or healthcare staff, a contractor, or a responsible party may not employ, contract with, or accept the volunteer services of healthcare providers or healthcare staff persons who are working, learning, studying, assisting, observing or volunteering at a healthcare setting unless the healthcare providers or healthcare staff persons are fully vaccinated against COVID-19 or have a documented medical or religious exception.

(4) On or before October 18, 2021, healthcare providers and healthcare staff must provide their employer, contractor or responsible party with either:

(a) Proof of vaccination showing they are fully vaccinated; or

(b) Documentation of a medical or religious exception.

(A) A medical exception must be corroborated by a document signed by a medical provider, who is not the individual seeking the exception, on a form prescribed by the Oregon Health Authority (OHA) or a similar form that contains all of the information required in the OHA form, certifying that the individual has a physical or mental impairment that limits the individual's ability to receive a COVID-19 vaccination based on a specified medical diagnosis, and that specifies whether the impairment is temporary in nature or permanent.

(B) A religious exception must be corroborated by a document, on a form prescribed by the Oregon Health Authority (OHA) or a similar form that contains all of the information required in the OHA form, signed by the individual stating that the individual is requesting an exception from the COVID-19 vaccination requirement on the basis of a sincerely held religious belief and including a statement describing the way in which the vaccination requirement conflicts with the religious observance, practice, or belief of the individual.

(5) Employers of healthcare providers or healthcare staff, contractors and responsible parties who grant an exception to the vaccination requirement under section (4) of this rule must take reasonable steps to ensure that unvaccinated healthcare providers and healthcare staff are protected from contracting and spreading COVID-19.

(6) On or before October 18, 2021, all employers of healthcare providers or healthcare staff, contractors, and responsible parties must have documentation that all healthcare providers and healthcare staff are in compliance with section (4) of this rule.

(7) Nothing in this rule is intended to prohibit employers of healthcare providers or healthcare staff, contractors and responsible parties from:

(a) Complying with the Americans with Disabilities Act and Title VII of the Civil Rights Act, and state law equivalents, for individuals unable to be vaccinated due to a medical condition or a sincerely held religious belief.

(b) Having more restrictive or additional requirements, including but not limited to requiring healthcare providers and healthcare staff to have documentation of an additional or booster dose of a COVID-19 vaccine if that is recommended by the U.S. Centers for Disease Control and Prevention.

(c) Imposing these requirements at an earlier date.

(8) The vaccination documentation and documentation of medical and religious exceptions described in section (4) of this rule must be:

(a) Maintained in accordance with applicable federal and state laws;

(b) Maintained for at least two years; and

(c) Provided to the Oregon Health Authority upon request.

(9) Employers of healthcare providers or healthcare staff, contractors and responsible parties who violate any provision of this rule are subject to civil penalties of $500 per day per violation.